O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOREVER 21, INC., | Case No. 2:10-cv-05485-ODW(JCGx) |
| Plaintiff, | **ORDER DENYING MOTION FOR CONTEMPT [40]** |
| v. | |
| ULTIMATE OFFPRICE, INC., | |
| Defendant. | |

## I.    INTRODUCTION

This contempt action arises from the Court's October 11, 2011 Final Judgment and Permanent Injunction.  (ECF No. 35.)  Forever 21 now moves to hold Ultimate Offprice in contempt of the Permanent Injunction for its sale of garments bearing ablated Forever 21 marks.[1]

## II.    FACTUAL BACKGROUND

Plaintiff Forever 21 is a retailer of fashion apparel and accessories.  (Mot. 4.) Forever 21's clothing is identified by an extensive portfolio of trademarks.  (Kwon Decl. Ex. A–H.)  Defendant Ultimate is in the business of buying and selling closeout garments—items that are left over, returned, or cancelled—in the secondary market.  (Opp'n 2.)

---

[1] Having carefully considered the papers filed in support of and in opposition to the instant Motion, the Court deems the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78; L. R. 7-15.

On July 23, 2010, Forever 21 sued Ultimate for infringement of its intellectual-property rights.[2]   The infringement action arose from Ultimate's unauthorized distribution and sale of garments bearing the following Forever 21 trademarks:

  

(ECF No. 35.)  Ultimate orders large quantities of garments sight-unseen and can only determine the existence of attached trademarks upon delivery.  (Opp'n 2.)  After Forever 21 brought suit, Ultimate instituted procedures to eliminate any remaining trademark indicia from the clothing it sells.  (Sfadia Decl. ¶ 8.)  Ultimate obtained a copy of a Forever 21 instruction sheet explaining procedures to eliminate trademarks from apparel that would be sold in the secondary market.  (*Id*. Ex. 3.)  Ultimate's employees were instructed to take out hang tags and labels or, if not feasible, to punch holes in the labels of the clothing bearing retailer trademarks. (Opp'n 3; Sfadia Decl. ¶ 5.)

On October 7, 2011, the parties stipulated to entry of the Final Judgment, which included a permanent injunction, as a part of a confidential settlement of the suit. (ECF No. 35.)  The Final Judgment and Permanent Injunction were entered by the Court on October 11, 2011, enjoining Ultimate from the following:

> (a) copying, manufacturing, exporting, marketing, displaying,
>     selling offering for sale, reproducing, brokering, consigning,
>     shipping, licensing, developing, delivering or *distributing any*
>     *product or services that uses, or otherwise makes use of,*

---

[2] Forever 21 sued Ultimate for infringement of Forever 21's federally registered trademarks under 15 U.S.C. § 1114(1), for dilution of federally registered and common law trademarks under 15 U.S.C. § 1125(c) and California Business and Professions Code section 14247, for unfair competition under 15 U.S.C. § 1125(a), and for declaratory relief.

*Plaintiff's Forever 21 Trademarks*, and/or any intellectual property that is confusingly or substantially similar to, or that constitutes a colorable imitation of Plaintiff's Forever 21 Trademarks in connection with internet use, website, domain name, metatags, advertising, promotions, solicitations, commercial exploitation, television, web-based or any other program, or any product or service otherwise;

(b) performing or allowing others employed by or representing it, or under its control, to perform any act which is likely to injure Plaintiff's rights in the Forever21 Trademarks; and

(c) engaging in any acts of federal and/or state trademark infringement, false designation, unfair competition, and dilution, which would damage or injure Plaintiff's rights in its Forever21 Trademarks.

(ECF No. 35 (emphasis added).)

Approximately one year later, Forever 21 began investigating a third party to this litigation, National Stores, Inc., for trademark infringement.  (Mot. 3–4.)  On October 19, 2012, Forever 21's investigator purchased what appeared to be Forever 21 garments from two of National's retail outlets.  (Heaney Decl. ¶ 2, ¶ 5, ¶ 6, Ex. A, D, E; Vener Decl. ¶ 6.)  Forever 21 then sued National for infringement.  (Mot. 7.)

During discovery, National provided Forever 21 with the invoices for the garments purchased by Forever 21's investigator.  (Mot. 7.)  Some of these invoices had been issued to National by Ultimate.  (Vener Decl. ¶ 8, Ex. F.)  Examination of the invoice dated September 7, 2012, reveals that five of the allegedly infringing garments originated with Ultimate.[3]  (*Compare* Vener Decl. ¶ 8–9, Ex. F, G *with* Heaney Decl. ¶ 4 Ex. C, *and* Kwon Decl. ¶ 12, Ex. J.)

---

[3] The September 7, 2012 invoice issued by Ultimate to National includes five garments that display product descriptions and style numbers that match the product descriptions and style numbers of the garments obtained by Forever 21's investigator: (1) SURPLCE PLTD METALLIC Style No. 46559;

The garments Ultimate sold to National bore labels with manually manipulated or mutilated marks.  (Mot. 4.)  Figure A below contrasts marks visible on the label of the garments Forever 21's investigator purchased from National with Forever 21's authorized marks.  (*Id.* at 8–9.)

| ULTIMATE OFFPRICE | FOREVER 21 |
|---|---|
|  |  |
|  |  |
|  |  |

**Figure A**

On August 5, 2013, Forever 21 brought a motion to hold Ultimate in contempt of court for violating the Permanent Injunction.  (ECF No. 35.)  Forever 21 alleges that Ultimate's distribution and sale of garments with mutilated or manipulated marks improperly "makes use of" Forever 21's trademarks in violation of the Permanent Injunction.  (Mot. 3–4.)

### III.   LEGAL STANDARD

District courts have the inherent power to enforce their orders through civil contempt.  *Spallone v. United States*, 493 U.S. 265, 276 (1990); *Cal. Dep't. of Soc.*
///

---

(2) SHLDR W/BOW Style No. 4884; (3) CRT TIE NCK SOLID Style No. 44313; (4) SKATER LACE OVERLAY Style No. 48862; and (5) FOIL METALLIC BODYCON Style No. 6419.

*Servs. v. Leavitt*, 523 F.3d 1025, 1033 (9th Cir. 2008).  A party to the original action may invoke the Court's power by initiating a proceeding for civil contempt.  *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 444–45 (1911).

To establish liability, the party alleging contempt must demonstrate by clear and convincing evidence that the alleged contemnor violated a specific and definite order of the Court by failing to "take all reasonable steps within the party's power to comply."  *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993).   Upon such a showing, the burden shifts to the contemnor to demonstrate why they were unable to comply.  *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1239 (9th Cir. 1999).

Contempt need not be willful—intent is irrelevant to a finding of civil contempt.  *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 856–57 (9th Cir. 1992).  But a party should not be found in contempt if the violation is based on a good-faith and reasonable interpretation of the Court's order.  *Dual-Deck*, 10 F.3d at 695.  Additionally, a party's substantial compliance with a court order is a defense to civil contempt and "is not vitiated by a few technical violations where every reasonable effort has been made to comply."  *Id.*

In the context of trademark-infringement actions, a party who has once infringed is allowed less leniency for purposes of injunction enforcement than an innocent party.  *Wolfard Glassblowing Co. v. Vanbragt*, 118 F.3d 1320, 1322 (9th Cir. 1997).  A prior infringer must keep a fair distance from the "margin line."  *Id.*  This requirement exists to protect the plaintiff from the scenario where the enjoined infringer makes an insignificant change and begins a new trademark contest in the context of a contempt hearing.  *Id.* at 1323.  But the infringer is not required to stay so far away from the margin line that it is put out of business.  *Id.*

District courts have wide latitude in determining whether there has been a contemptuous violation of its order and broad equitable power to order appropriate relief.  *FTC v. EDebitPay, LLC*, 695 F.3d 938, 945 (9th Cir. 2012); *Stone*, 968 F.2d at

856.  Appropriate sanctions may be imposed to coerce the contemnor into compliance with the court's order, to compensate the complainant for losses sustained as a result of the contemptuous behavior, or both.  *United States v. United Mine Workers*, 330 U.S. 258, 303–04 (1947); *United States. v. Bright*, 596 F.3d 683, 696–97 (9th Cir. 2010).

## IV.   DISCUSSION

To establish that Ultimate is in contempt, Forever 21 must prove by clear and convincing evidence that Ultimate violated the definite terms of the Permanent Injunction by failing to take all reasonable steps within its power to comply with the injunction.  Forever 21 must additionally show that any violation was not based on a good-faith and reasonable interpretation of the injunction.  For the reasons discussed below, the Court finds that Forever 21 failed to prove that Ultimate's distribution and sale of garments containing manually ablated Forever 21 marks is a sufficient violation to hold Ultimate in contempt of the Permanent Injunction.

Forever 21 contends that Ultimate has violated the terms of the Permanent Injunction by its distribution and sale of garments containing manually excised Forever 21 marks.  (Mot. 7–8.)  As an initial matter, the injunction does not on its face prohibit Ultimate from buying and selling garments containing mutilated Forever 21 marks.  (ECF. No. 35.)  The pertinent portion of the injunction prohibits Ultimate's distribution or sale of "any product or services that *uses, or otherwise makes use of*, Plaintiff's Forever 21 Trademarks."  (*Id.* (emphasis added).)  Accordingly, to establish that Ultimate is in contempt, Forever 21 must prove that Ultimate's sale of garments with ablated labels makes use of Forever 21's marks.

Forever 21 contends that Ultimate's sale of garments containing effaced Forever 21 marks makes use of the protected trademarks because enough of the mark remains for consumers to recognize that the marks belong to Forever 21.  (Mot. 4, 9.)  Forever 21 asserts this alone is sufficient evidence to find a willful violation of the Court's injunction.  The Court finds this argument to be threadbare.

The Permanent Injunction required Ultimate to take all reasonable steps to comply with its terms.   To this end, Ultimate obtained a copy of a Forever 21 instruction sheet[4] detailing procedures to eliminate trademarks from garments. Ultimate instructed its employees to take out hang tags and remove or ablate labels bearing Forever 21 trademarks.   (Opp'n 3; Sfadia Decl. ¶ 5, ¶ 8, Ex. 3.)   Figure B depicts an example of a manipulated label.



**Figure B**

The Court views Ultimate's actions not as trivial modifications designed to skirt the line of the injunction, but rather as a reasonable attempt to comply with the Court's order.   The permanent injunction plainly prohibits Ultimate from making use of Forever 21's marks.   (ECF No. 35.)   So, Ultimate instructed its employees to ablate any Forever 21 marks remaining in the garments.   It was reasonable for Ultimate to believe that the sale of garments with punched-out Forever 21 marks would not be "making use" of Forever 21's marks.   Ultimate could not make use of Forever 21's marks   if   the   garments   no   longer   contained   the   protected   marks. / / /

---

[4] Though the source and vintage of this Form NPI-2 instruction sheet is unclear, it nevertheless instructs Ultimate's efforts to comply with the Court's Permanent Injunction.  The instruction sheet illustrates how Forever 21 required its trademarks to be eliminated from garments destined for the secondary market.  Additionally, Forever 21 does not dispute the authenticity of the form.  (ECF No. 46.)

It is difficult to guess what superior measures Ultimate could have instituted to comply with the injunction's prohibition of use of Forever 21's marks.  Because Ultimate orders large quantities of garments sight-unseen, it can only determine the existence of trademarks upon delivery.  (Opp'n 2.)  Thus, Ultimate's only option to comply with the injunction is to manipulate the visible marks upon receipt.

Ultimate could remove the marks by interlineation, bleaching, excising or punching out the label's protected mark, or full label removal.  Interlineation risks leaving much of the mark visible and fading with continued use of the garment.  Bleaching also may leave much of the mark visible and carries the additional risk of ruining surrounding portions of the garment.  Full label removal is often not an option, as the Forever 21 instruction sheet reflects, because removal of stitched-in tags can compromise the integrity of the garment.  Excising or punching out the protected Forever 21 mark, while leaving the remainder of the label intact, strikes a reasonable balance of removing the identifying characteristics of the mark while maintaining the integrity of the garment.  Indeed, the Forever 21 instruction sheet encourages excising the mark portion of the label.  (Sfadia Decl. ¶ 8; Reinis Decl. Ex. 3.)

Notably, nowhere in its motion does Forever 21 offer any additional or alternative steps Ultimate could have taken to comply with the injunction short of a complete cessation of sale of any garments that once bore a Forever 21 mark.  Even a prior infringer is not required to stay so far away from the margin line that it is put out of business.  *Wolfard Glassblowing*, 118 F.3d at 1322.

Forever 21 argues that Ultimate's mark-removal procedures do not measure up because some garment labels retain enough of the protected mark for consumers to recognize that the marks belong to Forever 21.  Forever 21 points to a few photographs[5] that show labels retaining hanging chads or traces of the 'F' or the '1'

---

[5] The September 7, 2012 invoice reflects that many of the garments pictured in the declaration of Young Kwon were not garments that Ultimate sold to National.  (Kwon Decl. Ex. J at 37–45, 61–63.)  Similarly, Ultimate did not sell any of the clothing depicted in Exhibit E to Brian Heaney's

contained in the Forever 21 mark.  (Mot. 8–9.)  Two examples are depicted in Figure
C below:



**Figure C**

In both of these photos it is clear that Ultimate attempted to punch out the
trademark indicia, but the chads had simply not fallen out.  The Court views these
labels as relatively minor technical violations that are insufficient to vitiate Ultimate's
substantial compliance with the injunction.   Ultimate's conduct in manually
manipulating the garment labels to remove the protected marks demonstrates that it
has taken all reasonable steps within its power to avoid making use of Forever 21's
trademarks in compliance with the injunction.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

declaration.  Although Forever 21 does not explicitly represent to the Court that Ultimate sold these
items, their inclusion in exhibits repeatedly referenced in this motion is confusing and misleading.

# V.   CONCLUSION

Forever 21 has not established by clear and convincing evidence that Ultimate failed to substantially comply with a reasonable interpretation of the Final Order and Permanent Injunction.  Therefore, Forever 21's Motion to hold Ultimate in contempt is **DENIED**.

**IT IS SO ORDERED.**

September 3, 2013

 

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**